# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KONINKLIJKE PHILIPS N.V.,**<br><br>Plaintiff,<br><br>vs.<br><br>**IDEAVILLAGE PRODUCTS CORP.,**<br><br>Defendant. | Civ. No. 2:21-cv-08706-KM-ESK<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

Plaintiff Koninklijke Philips N.V., LLC ("Philips") initiated this design patent infringement action against IdeaVillage Products Corporation.[1]

---

[1]    Citations to the record are abbreviated as follows:

"Compl." = Complaint (ECF no. 1)

" '661 Patent" or "Grooming Apparatus" = Patent D758,661 (ECF no. 1-1)

" '368 Patent" or "Handle for Grooming Apparatus" = Patent D788,368 (ECF no. 1-4)

" '878 Patent" or "Shaving Head" = Patent D776,878 (ECF no. 1-5)

" '972 Patent" or "Blade for Hair Cutting Appliance" = Patent D870,972 (ECF no. 1-6)

" '346 Patent" or "Blade Set" = Patent D905,346 (ECF no. 1-7)

" '859 Patent" or "Nose and Ear Trimmer" = Patent D748,859 (ECF no. 1-8)

"Def. Br." = Brief in Support of Defendant IdeaVillage Products Corp.'s Motion to Dismiss (ECF no. 11-1)

"Ex. A" = Plaintiff's Exhibit A (ECF no. 1-1)

"Ex. B" = Plaintiff's Exhibit B (ECF no. 1-2)

"Ex. C" = Plaintiff's Exhibit C (ECF no. 1-3)

"Ex. D" = Plaintiff's Exhibit D (ECF no. 1-4)

"Ex. E" = Plaintiff's Exhibit E (ECF no. 1-5)

1

("IdeaVillage"). IdeaVillage moves to dismiss the Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons provided herein, I grant in part and deny in part IdeaVillage's motion to dismiss.

## I.    BACKGROUND[2]

The facts alleged in the Complaint are accepted as true for purposes of this motion. Philips, a company organized and existing under the laws of the Netherlands, is in the business, among other things, of manufacturing personal grooming products such as shavers and trimmers. (Compl. ¶¶2, 7). Philips owns hundreds of design patents related to its men's grooming products. (Compl. ¶8).

In 2016, Philips released its OneBlade men's shaver, which Philips claims, "comprised a wholly new and distinctively unique product design" and "greatly departed from the traditional ... foil and rotary electric shavers then in the marketplace." (Compl. ¶¶9, 10). To protect the overall design of the OneBlade shaver, Philips owns various design patents, including: (1) the '661 Patent; (2) the '368 Patent; (3) the '878 Patent; (4) the '972 Patent; and (5) 'the 346 Patent ("collectively, the Asserted Patents"). (Compl. ¶¶12–15).

In addition to its OneBlade shaver, Phillips manufacturers and sells a nose hair trimmer which Philips claims "stands out to an observing consumer." (Compl. ¶¶17, 19). To protect the overall design of Philips' nose hair trimmer, Philips owns the '859 Patent. (Compl. ¶18).

IdeaVillage is a "direct-to-consumer" marketer which sells men's grooming products under its MicroTouch brand. These include the first and

---

"Ex. F" = Plaintiff's Exhibit F (ECF no. 1-6)

"Ex. G" = Plaintiff's Exhibit G (ECF no. 1-7)

"Pl. Br." = Plaintiff Koninklijke Philips N.V.'s Opposition to Defendant IdeaVillage Products Corp.'s Motion to Dismiss (ECF no. 23)

[2]     For purposes of this motion to dismiss I take all allegations in the complaint to be true and draw all inferences in favor of Philips as plaintiff. *See* Section II.A, *infra*.

second generation MicroTouch Solo shavers ("collectively, MicroTouch Solos") and MicroTouch Titanium Max trimmer. (Compl. ¶¶20-21, 26).

On April 8, 2021, Philips filed a six-count complaint against IdeaVillage, claiming that the use, manufacture, sale, offer to sell, or importation of its MicroTouch Solos and MicroTouch Titanium Max constitutes design patent infringement of each of the Asserted Patents under 35 U.S.C. §§ 271(a) and 289. (Compl. ¶¶33, 46, 59, 71, 83 and 96).

In Count 1, Philips alleges that IdeaVillage's MicroTouch Solos copy the patented ornamental design of its Grooming Apparatus. (Compl. ¶36). (The Philips Grooming Apparatus and Microtouch Solos are displayed for comparison in Ex. 1 to this Opinion.)

In Count 2, Philips alleges that IdeaVillage's MicroTouch Solos copy the patented ornamental design of its Handle for Grooming Apparatus. (Compl. ¶49). (The Philips Handle for Grooming Apparatus and MicroTouch Solos are displayed for comparison in Ex. 2 to this Opinion.)

In Count 3, Philips alleges that IdeaVillage's first generation MicroTouch Solo copy the patented ornamental design of its Shaving Head. (Compl. ¶61). (The Philips Shaving Head and first generation MicroTouch Solo are displayed for comparison in Ex. 3 to this Opinion.)

In Count 4, Philips alleges that IdeaVillage's first generation MicroTouch Solo copy the patented ornamental design of its Blade for Hair Cutting Appliance. (Compl. ¶ 73). (The Philips Blade for Hair Cutting Appliance and first generation MicroTouch Solo are displayed for comparison in Ex. 4 to this Opinion.)

In Count 5, Phillips alleges that IdeaVillage's MicroTouch Solos copy the patented ornamental design of its Blade Set. (Compl. ¶ 86).[3] (The Philips Blade

---

[3]     The Complaint incorrectly identifies the '346 patent as the Blade for Hair Cutting Appliance.

3

Set and MicroTouch Solos are displayed for comparison in Ex. 5 to this Opinion.)

In Count 6, Philips alleges that IdeaVillage's MicroTouch Titanium Max copy the patented ornamental design of its Nose and Ear Trimmer. (Compl. ¶ 98). (The Philips' Nose and Ear Trimmer and MicroTouch Titanium Max are displayed for comparison in Ex. 6 to this Opinion.)

The Complaint seeks damages and costs, as well as declaratory and injunctive relief. (Compl. ¶¶33, 46, 59, 71, 83 and 96).

## II.  LEGAL STANDARDS

### A. Motion to Dismiss

Generally, district courts adjudicating patent cases apply the law of the Federal Circuit, where the matter "is intimately involved with the substance of patent laws." *NovaPlast Corp. v. Inplant, LLC*, 2021 WL 389386, at *4 (D.N.J. Feb. 3, 2021) (citing *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012)). However, the question of whether to grant a Rule 12(b)(6) motion, "is a purely procedural question not pertaining to patent law," to which the Federal Circuit applies the rule of the regional circuit. *C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1306 (Fed. Cir. 2000); *see also Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018) ("We review procedural issues, including the grant of a motion to dismiss, according to the law of the respective regional circuit."); *NovaPlast*, 2021 WL 389386, at *4.

In *Robern, Inc. v. Glasscrafters, Inc.*, this Court held as a matter of first impression that the *Iqbal/Twombly* standard applies to complaints alleging patent infringement after the abrogation of Federal Rule of Civil Procedure 84 and patent pleading Form 18. 206 F. Supp. 3d 1005, 1010 (D.N.J. 2016). Robern noted that both the Supreme Court of the United States and the United States Court of Appeals for the Third Circuit have held that the *Iqbal/Twombly* pleading standard applies in all civil cases and, since "the abrogation of Rule

4

84 and Form 18, there is no longer any credible conflict between Supreme Court precedent and Form 18." *Id.*

Those standards are familiar and well-established. Federal Rule of Civil Procedure 8(a) does not require that a complaint contain factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Philips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' … it asks for more than a sheer possibility." *Id.*

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels &*

*Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips*, 515 F.3d at 231.

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

When deciding a motion to dismiss, a court typically does not consider matters outside the pleadings. However, a court may consider documents that are "integral to or explicitly relied upon in the complaint" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (emphasis and citations omitted*); see also In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Therefore, courts may consider matters of public record and exhibits attached to the complaint. *Schmidt*, 770 F.3d at 249 ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record"); *Arcand v. Brother Int'l Corp.*, 673 F. Supp.2d 282, 292 (D.N.J. 2009) (stating that a court may consider documents referenced in complaint that are essential to plaintiff's claim).

Reliance on these types of documents does not convert a motion to dismiss into a motion for summary judgment. "When a complaint relies on a document … the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, Inc., 998 F.2d 1192, 1196-

6

97 (3d Cir. 1993). As pertinent here, I may consider the cited patents, which are the very foundation of the complaint and are attached to it as exhibits.

### B. Design Patent Infringement

Federal patent law permits those who invent designs for manufactured articles to patent their designs. 35 U.S.C. § 171(a). Patent protection is available for a "new, original and ornamental design for an article of manufacture." *Id.* A patentable design "gives a peculiar or distinctive appearance to the manufacture, or article to which it may be applied, or to which it gives form." *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 525 (1871); *see also Samsung Elecs. Co., Ltd. v. Apple Inc.*, 137 S. Ct. 429, 432-33 (2016).

Generally, patent infringement analysis involves two steps: (1) claim construction and (2) claim comparison. *Curver Luxembourg, SARL v. Home Expressions Inc.*, 2018 WL 340036, at *3 (D.N.J. Jan. 8, 2018), *aff'd*, 938 F.3d 1334 (Fed. Cir. 2019).

First, the court construes the patent. *Luxembourg*, 2018 WL 340036, at *3; *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372-74 (1996); *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007). Claim construction is an issue of law committed to the district judge for determination. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1337 (Fed. Cir. 2015); *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (holding that claim construction is "a matter of law exclusively for the court").

In the case of design patents, for which physical appearance is a paramount consideration, the claim construction process is often uncomplicated. Relevant precedent requires simply that the court construe the design patents as they are shown in the patent drawings. *Id.*; *see also MSA Prods., Inc. v. Nifty Home Prods., Inc.*, 883 F. Supp. 2d 535, 540-41 (D.N.J. 2012). "Design patents are typically claimed as shown in drawings, and claim construction must be adapted to the pictorial setting." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302 (Fed. Cir. 2010). "Depictions of the claimed

design in words can easily distract from the proper infringement analysis of the ornamental patterns and drawings." *Id.*; *see also Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008); *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1377 (Fed. Cir. 2002).

Second, the design patent's claims are compared to the allegedly infringing products. *Luxembourg*, 2018 WL 340036, at *3; *see also PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1362 (Fed. Cir. 2005). This step involves a factual determination. *See id.* at 1364. When considering infringement of a design patent, courts use the "ordinary observer" test. *Crocs*, 598 F.3d at 1303. Under the ordinary observer test, infringement is defined as follows:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528 (1871); *Egyptian Goddess*, 543 F.3d at 670-71. This test was codified in the Patent Act of 1952, which provides as follows:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

35 U.S.C. § 289.

Infringement is not found unless the accused article embodies the patented design or any colorable imitation of it. *Egyptian Goddess*, 543 F.3d at 678. If no ordinary observer could determine that the allegedly infringed patent and the allegedly infringing article are substantially the same, dismissal is appropriate. *Id.*; *see also MSA Prods.*, 883 F. Supp. 2d at 541.

8

### III.   DISCUSSION

I discuss the two steps of the analysis in order: First, the construction of the claims as a matter of law, and second, the comparison of each claim to the allegedly infringing product, as a matter of fact.

#### A. Claim Construction

Courts often need not conduct an elaborate claim construction analysis for design patents because the court should generally construe design patents as they are shown in the patent drawings. *MSA Prods.,* 883 F. Supp. at 540-41 (D.N.J. 2012). "[A] design [patent] is better represented by an illustration 'than it could be by any description and a description would probably not be intelligible without the illustration.'" *Egyptian Goddess*, 543 F.3d at 679 (citing *Dobson v. Dornan*, 118 U.S. 10, 14 (1886)); *see also Manual of Patent Examining Procedure* § 1503.01 (9th ed. 2015) ("[A]s a rule the illustration in the drawing is its own best description."). For those reasons, a court is not obligated to issue a detailed verbal description of the design if it would not be helpful. *Egyptian Goddess*, 543 F.3d at 679-80. Here, the drawings render verbal comparison a redundant, and often inferior, mode of claim construction.

#### B. Claim Comparison

The second stage of the patent infringement analysis is claim comparison. Here, the claim is compared to the allegedly infringing product. *See PC Connector Sols.*, 406 F.3d at 1362. In design patent cases, the court employs the "ordinary observer test." *Egyptian Goddess*, 543 F.3d at 670; *Pacific Coast*, 739 F.3d at 701. That test, as noted above, is as follows:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Id.* (citing *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528 (1871).[4] The specific designs used for comparison are the figures in the patent and images of the accused product. *See Crocs*, 598 F.3d at 1302-03. "The patentee must establish that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010); *see Crocs*, 598 F.3d at 1302-03.

Philips contends, however, that "[u]nder the liberal pleading standards of Rule 8(a), a patentee need only plead enough facts sufficient to put the alleged infringer on notice to answer the complaint." (Pl. Br. 4-6.) Therefore, to survive a Rule 12(b)(6) motion, Philips argues, a claim of design patent infringement only requires "(1) alleging ownership of the asserted patent; (2) naming of each individual defendant; (3) citing the patent that is allegedly infringed; (4) describing the means of alleged infringement; and (5) pointing to the specific sections of the patent law invoked." *Id.* at 4-5 (citing *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.*, 203 F.3d 790, 794 (Fed. Cir. 2000)).

Philips is mistaken as to the relevant motion to dismiss standard. As an initial matter, *Phonometrics* predates *Iqbal* and *Twombly* and is therefore no longer authoritative as to Rule 12(b)(6) standards. *See Steven Madden, Ltd. v. Yves Saint Laurent*, 2019 WL 2023766, at *4 (S.D.N.Y. May 8, 2019); *Scripps Rsch. Inst. v. Illumina, Inc.*, 2016 WL 6834024, at *5 (S.D. Cal. Nov. 21, 2016); *e.Digital Corp. v. iBaby Labs, Inc.*, 2016 WL 4427209, at *4 (N.D. Cal. Aug. 22, 2016). Moreover, as stated earlier, this Court's decision in *Robern* removes all doubt that the *Iqbal/Twombly* standard applies to complaints alleging patent infringement after the abrogation of Rule 84 and patent pleading Form 18. 206 F. Supp. 3d 1005, 1010 (D.N.J. 2016).[5]

---

[4]      This test has been codified in 35 U.S.C. § 289, quoted at in subsection II.A.b, *supra*.

[5]      Philips similarly cites *Hall v. Bed Bath & Beyond.*, 705 F.3d 1357 (Fed. Cir. 2013)—relying, in part, on *Phonometrics* for the following propositions: (1) a complaint is only required to "identif[y] the patent, show[] the patented design, and describe[] the

That is a distinction with a difference in the context of design patents. While patent infringement is indeed a question of fact, if a court after employing the ordinary observer test finds that no reasonable factfinder could find infringement, that court may dismiss a design infringement claim on a Rule 12(b)(6) motion under the *Twombly/Iqbal* standard. *See Luxembourg*, 2018 WL 340036 at *9; *accord Colida v. Nokia, Inc.*, 347 F. App'x 568, 569-70 (Fed. Cir. 2009); *MSA Prods.*, 883 F. Supp. 2d at 540; *Parker v. Kimberly-Clark Corp.*, 2012 WL 74855, at *2-3 (N.D. Ill. Jan. 10, 2012); *Kellman v. Coca-Cola Co.*, 280 F. Supp. 2d 670, 679-80 (E.D. Mich. 2003).

The dispositive question here, based primarily on the drawings themselves, is whether Philips has plausibly alleged that an ordinary observer would mistake IdeaVillage's MicroTouch Solos and MicroTouch Titanium Max for the products depicted in the Asserted Patents.

        *i.    '661 and '368 patents (Counts 1 and 2)*

I have visually compared the drawings of the '661 and '368 patents (Compl Exs. A and D) to the photographs of the MicroTouch Solos (Compl Exs. B and C). (Those visual comparisons are conveniently reproduced as Exs. 1 and 2 to this Opinion.) I find that infringement is not plausibly alleged. Under the ordinary observer test, the '661 and '368 patent designs are not substantially similar to the MicroTouch Solo exemplars. Consequently, an

---

accused [device]" to survive dismissal on a Rule 12(b)(6) motion; and (2) that the reviewing court is not tasked with "evaluating the weight of the evidence offered to support the alleged claims in the complaint." Pl. Br. 6, 8.

     Leaving aside this Court's view on the precedential value of *Phonometrics* in a post-*Twombly/Iqbal* world, the court in *Hall* reversed the district court's dismissal of the design patent infringement claim based on the trial court's *failure* to apply the "ordinary observer" test, as well as the trial court's application of the "point of novelty test" rejected by the Federal Circuit in *Egyptian Goddess*. *Hall*, 705 F.3d at 1363-64; *see also Egyptian Goddess*, 543 F.3d 665, 678-79 ("[W]e hold that the 'ordinary observer' test should be the sole test for determining whether a design patent has been infringed.").

ordinary observer would not be induced to mistake one for the other. *See Egyptian Goddess*, 543 F.3d at 682–83.

Both the Philips Grooming Apparatus and Handle for Grooming Apparatus, as depicted in the '661 and '368 patents, have a distinct U-shaped design located roughly in the middle of the shaver handle, along with a second U or hook-like curve near the bottom of the handle. By contrast, those distinctive features are absent from the MicroTouch Solos.

The backs of the Grooming Apparatus and the Handle for Grooming Apparatus lack any markings aside from one single line at the bottom of the handle. The backs of the MicroTouch Solos, in contrast, contain various embellishments, including a light, a power button, and a centrally-located strip.

Finally, and most notably, the MicroTouch Solos prominently feature the "SOLO" branding vertically in the center of the handle. No such designation appears on the Philips OneTouch shavers.

There are, to be sure, some ornamental similarities. The '661 and '368 patented designs and the MicroTouch Solos all have narrow shaving handles with slightly rounded backs. Still, because of the substantial differences in appearance noted above, no ordinary observer would purchase a MicroTouch Solo believing it to be the OneTouch shaver embodied in the '661 patent or '368 patent.

The motion to dismiss is therefore granted as to Counts 1 and 2.

>    *ii.    '878 patent (Count 3)*

After conducting a side-by side comparison of the shaving heads in the '878 patent drawings (Compl. Ex. E) and photographs of the first generation MicroTouch Solo (Compl. Ex. B), I find that there is sufficient similarity between the products to plausibly allege design infringement. (That visual comparison is conveniently reproduced at Exhibit 3 to this Opinion.)

IdeaVillage claims that the shaving head of the first generation MicroTouch Solo is distinguishable based on its "shaving head with an exposed rocker structure." (Pl. Br 9) This feature, however, is visibly apparent only from a perspective and front elevational view of the MicroTouch solo. Viewed from a rear, right side, and left side elevational view, as well as from a top and bottom plan view, the two appear quite similar—or so a fact finder could conclude.

In the absence of more notable differences in the ornamental design of the two products, I find that Philips has plausibly alleged that the '878 patent and the first generation MicroTouch Solo shaving head are sufficiently similar to set forth a claim that they would deceive the ordinary observer. The motion to dismiss is therefore denied as to Count 3.

### iii.    '972 and '346 patents (Counts 4 and 5)[6]

I start with Count 4, which covers the first generation MicroTouch Solo blade. Upon examining drawings of both the '972 and '346 patents (Compl. Ex. F and G) and photographs of the first generation MicroTouch Solo blade, I find that Philips has plausibly alleged that there is sufficient similarity between the products.[7] (The visual comparison is conveniently reproduced at Exhibit 4 to this Opinion.)

Arguing that the products are not sufficiently similar, IdeaVillage highlights numerous minor design features of the at-issue patents that are not present in the IdeaVillage product. These include (1) "[a] blade with a flat

---

[6]    In its motion to dismiss, IdeaVillage asserts that the fact that the USPTO examiner reviewing the '346 and '972 patents under an ordinary observer standard "reviewed [IdeaVillage's] '627 and '325 Patents" and still issued the '346 and '972 patents establishes that the "Philips and IDV designs are not 'substantially similar' and 'patentably distinct,'" thus precluding me from making a finding of infringement. Def. Br. 15-16. Taken to its extreme, IdeaVillage's argument would tend to suggest that there can be no challenge to a duly issued patent. Moreover, whether the cited IdeaVillage patents are the *same* patented ornamental designs for the MicroTouch Solos is a factual question inappropriate for resolution on a motion to dismiss.

[7]    Count IV of the Complaint only alleges design patent infringement as to the first generation MicroTouch Solo and not the second generation. Count V alleges that both MicroTouch Solo generations infringe the '346 patent.

continuous smooth middle top surface with no embellishment where at least a major portion of each tooth is integrally formed and coplanar with the middle top surface"; (2) "stationary teeth [that] are coplanar with the middle top surface"; (3) "[s]tationary teeth that are defined by elongated parallel sides extending outward from the center section with a flat end with rectangular base that has a tip that is narrower in width and ends with a point and the teeth are flat"; (4) "moving teeth are wrapped and covered by a second layer of stationary teeth that sits over the rear side of the moving teeth; and (5) "[s]tationary teeth that are parallel to the middle top portion of the blade … [and] flat throughout their length from back tip and that ends in a point and it shows that the stationary teeth are a rectangular shape." (Def. Br. 12-13).

I find, however, that such an analysis of these minute distinctions only confirms that Philips has plausibly alleged that the blades, overall, are sufficiently similar to deceive the ordinary observer. As the Federal Circuit has observed, "[d]epictions of the claimed design in words can easily distract from the proper infringement analysis of the ornamental patterns and drawings." *Crocs, Inc., v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302 (Fed. Cir. 2010). Therefore, "minor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement." *Id.* at 1303 (citing *Payless Shoesource v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993)). Here, I rely primarily on my own visual inspection of the depictions of the two products, giving lesser stress to the distinctions verbally described by IdeaVillage. The motion to dismiss Count 4, which covers only the first generation MicroTouch Solo blade, is therefore denied.

I move to Count 5, a challenge to the second generation MicroTouch Solo blade.[8] I find that the second generation MicroTouch Solo blade is not so similar as to suggest a plausible allegation of infringement of the '346 patent.

---

[8]     To the extent Count 5 is directed to the first generation MicroTouch Solo blade as well, it is redundant of Count 4. I will eliminate some clutter by treating Count 4 as a challenge to the first generation blade, and Count 5 as a challenge to the second generation blade.

(The visual comparison is conveniently reproduced at Exhibit 5 to this Opinion.) Unlike its first generation predecessor, the second generation MicroTouch Solo blade features a plastic middle top surface—missing from the '346 patent—and additionally bears the word "SOLO" prominently on the middle surface. There are certain ornamental similarities between the '346 patent and the second generation MicroTouch Solo. Nevertheless, the differences are such that no ordinary observer would purchase the second generation MicroTouch Solo blade believing it to be the '346 patent. The motion to dismiss Count 5 is therefore granted.

      *iv.*    *'859 patent (Count 6)*

Finally, after comparing the '859 patent design with the MicroTouch Titanium Max, I see sufficient similarity between the products to set forth a plausible allegation of design infringement. From a front view, the '859 patent and the MicroTouch Titanium Max appear to have a remarkably similar U-shaped design appearing in the middle of the handle, with a line immediately below the design wrapping around the handle. In addition, the '859 patent drawing and the MicroTouch Titanium Max have distinctive narrow cutting heads placed at the top of the trimmer with a similarly narrow and elongated hole housing the blade for the trimmers.

While there are some slight ornamental differences—such as the honeycomb design carved into the U-shaped design of the MicroTouch Titanium Max, which is not present in the '859 patent—I find that Philips has nevertheless plausibly alleged that the '859 patent and the MicroTouch Titanium Max are sufficiently similar to deceive the ordinary observer. The motion to dismiss is therefore denied as to Count 6.

## IV.    CONCLUSION

For the foregoing reasons, I will grant in part and deny in part IdeaVillage's motion to dismiss the complaint for failure to state a claim. Counts 1, 2, and 5 are dismissed; dismissal is denied, however, as to Counts 3, 4, and 6.

Dated: September 27, 2021

/s/ Kevin McNulty

_____
**KEVIN MCNULTY**
**United States District Judge**

16

**Exhibit 1**

  

Fig. 1, perspective view      Fig. 2, front elevational view      Fig. 3, rear elevational view

  

Perspective view of MicroTouch Solo shaver (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Front elevational view of MicroTouch Solo shaver (Ex. B Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Rear elevational view of MicroTouch Solo shaver (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

  

Perspective view of MicroTouch Solo shaver (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Front elevational view of MicroTouch Solo shaver (Ex. C , Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Rear elevational view of MicroTouch Solo shaver (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

**Exhibit 1**

  

Fig. 4, right side elevational view

Fig. 5, left side elevational view

Figs. 6-7, top and bottom plan views

   

Right side elevational view of MicroTouch Solo shaver (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Left side elevational view of MicroTouch Solo shaver (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Top and bottom plan views of MicroTouch Solo shaver (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

   

Right side elevational view of MicroTouch Solo shaver (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Left side elevational view of MicroTouch Solo shaver (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Top and bottom plan views of MicroTouch Solo shaver (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

**Exhibit 2**

  

FIG. 1      FIG. 2      FIG. 3

Fig. 1, perspective view    Fig. 2, front elevational view    Fig. 3, rear elevational view

  

Perspective view of MicroTouch Solo shaver handle (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))     Front elevational view of MicroTouch Solo shaver handle (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))     Rear elevational view of MicroTouch Solo shaver handle (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

  

Perspective view of MicroTouch Solo shaver handle (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))     Front elevational view of MicroTouch Solo shaver handle (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))     Rear elevational view of MicroTouch Solo shaver handle (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

**Exhibit 2**

  

Fig. 4, right side elevational view

Fig. 5, left side elevational view

Figs. 6-7, top and bottom plan views

   

Right side elevational view of MicroTouch Solo shaver handle (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Left side elevational view of MicroTouch Solo shaver handle (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Top and bottom plan views of MicroTouch Solo shaver handle (Ex. B. Tear-Down Pictures of MicroTouch Solo Shave (First Generation))

   

Right side elevational view of MicroTouch Solo shaver handle (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Left side elevational view of MicroTouch Solo shaver handle (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Top and bottom plan views of MicroTouch Solo shaver handle (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

**Exhibit 3**



FIG. 1



FIG. 2



FIG. 3

Fig. 1, perspective view

Fig. 2, front elevational view

Fig. 3, rear elevational view







Perspective view of
MicroTouch Solo shaving
head (Ex. B, Tear-Down
Pictures of MicroTouch Solo
Shaver (First Generation))

Front elevational view of
MicroTouch Solo shaving
head (Ex. B, Tear-Down
Pictures of MicroTouch Solo
Shaver (First Generation))

Rear elevational view of
MicroTouch Solo shaving
head (Ex. B, Tear-Down
Pictures of MicroTouch Solo
Shaver (First Generation))

**Exhibit 3**

  



Fig. 4, right side elevational view

Fig. 5, left side elevational view

Figs. 6-7, top and bottom plan views

  



Right side elevational view of MicroTouch Solo shaving head (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Left side elevational view of MicroTouch Solo shaving head (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Top and bottom plan views of MicroTouch Solo shaving head (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Exhibit 4



Figs. 1 and 2, top, front, right perspective view and bottom, rear, left perspective view

Figs. 3 and 4, top and bottom plan views

Fig. 5, right side elevational view



Top, front, right perspective view and bottom, rear, left perspective view of MicroTouch Solo shaver

Top and bottom plan views of MicroTouch Solo shaver blade (Ex. B, Tear-Down

Right side elevational view Top plan view of MicroTouch Solo shaver blade (Ex. B, Tear-Down

**Exhibit 4**









Fig. 6, left side elevational view

Fig. 7, rear elevational view

Figs. 8, front elevational view

Left side elevational view of MicroTouch Solo shaver blade (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Rear elevational view of MicroTouch Solo shaver blade (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

Front elevational view of MicroTouch Solo shaver blade (Ex. B, Tear-Down Pictures of MicroTouch Solo Shaver (First Generation))

**Exhibit 5**



Fig. 1, top, front, right perspective view

Figs. 3 and 4, top and bottom plan views

Fig. 5, right side elevational view











Top, front, right perspective view of MicroTouch Solo shaver blade (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Top and bottom plan views of MicroTouch Solo shaver blade (Ex. C Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Right side elevational view of MicroTouch Solo shaver blade (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

**Exhibit 5**



Fig. 6, left side elevational view

Fig. 7, rear elevational view

Fig. 8, front elevational view







Left side elevational view of MicroTouch Solo shaver blade (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Rear elevational view of MicroTouch Solo shaver blade (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

Front elevational view of MicroTouch Solo shaver blade (Ex. C, Tear-Down Pictures of MicroTouch Solo Shaver (Second Generation))

**Exhibit 6**

  

FIG. 1                    FIG. 2                    FIG. 4

Fig. 1, perspective view    Fig. 2, front elevational view    Fig. 4, right side elevational view

  

| Perspective view of MicroTouch Max Titanium trimmer (Ex. I, Pictures of MicroTouch Max Titanium Trimmer) | Front elevational view of MicroTouch Max Titanium trimmer (Ex. I, Pictures of MicroTouch Max Titanium Trimmer) | Right side elevational view of MicroTouch Max Titanium trimmer (Ex. I, Pictures of MicroTouch Max Titanium Trimmer) |